Gary L. Eastman, Esq. (CSB #182518)
Eastman & McCartney LLP
401 West A Street, Suite 1785
San Diego, CA 92101
(619) 230-1144

Attorneys for Plaintiff
STRATEGIC OPERATIONS, INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STRATEGIC OPERATIONS, INC., a California Corporation<br><br>Plaintiff,<br><br>vs.<br><br>BREA K. JOSEPH, an Individual; KASEY EROKHIN, an Individual; KBZ FX, an unknown business entity; KBZ FX, INC. a California Corporation; and DOES 1-10, inclusive,<br><br>Defendants. | **COMPLAINT FOR:**<br>**(1) INFRINGEMENT OF U.S. PATENT NO. 8,840,403;**<br>**(2) BREACH OF NONDISCLOSURE AGREEMENT; AND**<br>**(3) UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL**<br><br><br>**'17 CV 1539 MMA WVG** |

Plaintiff Strategic Operations, Inc., through its undersigned counsel, brings this action against Defendants Brea K. Joseph, an individual, Kasey Erokhin, an individual, KBZ FX, an unknown business entity, and Does 1-10 (collectively, "Defendants").

**NATURE OF THE ACTION**

1.      This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq., based on Defendants' infringement of United States Patent No. 8,840,403 ("the '403 Patent").

**THE PARTIES**

2.      Plaintiff Strategic Operations, Inc. ("StOps") is a California corporation with its principal place of business in the county of San Diego, California.

3.      StOps is recognized as a leading tactical trauma training company providing realistic training environments, training scenarios, and proprietary training products for military, law enforcement, and other organizations.

4.      Defendant Brea K. Joseph ("Joseph") is an individual residing in the county of San Diego, California and a former employee of StOps.  "Joseph" as used herein refers to Defendant Brea K. Joseph in her individual capacity.

5.      Defendant Kasey Erokhin ("Erokhin") is an individual residing in the county of San Diego, California and a former employee of StOps.  "Erokhin" as used herein refers to Defendant Kasey Erokhin in her individual capacity.

6.      StOps is informed and believes that Joseph was previously operating as a business under the fictitious trade name "KBZ FX" in the county of San Diego, California.  "KBZ FX" as used herein refers to the sole proprietorship business Defendant Brea K. Joseph is believed to own and operate.

7.      StOps is informed and believes that Erokhin and Joseph formed KBZ FX together as co-owners in late 2010/early 2011.  On information and belief, as of March 2016, Joseph became the sole owner of KBZ FX.  StOps is informed and believes that Erokhin continues to work for KBZ FX alongside Joseph.

8.      StOps is informed and believes that Erokhin and Joseph formed KBZ FX, Inc. in July of 2017, and has a principle place of business at 12544 Kirkham

Court, Suite 19, Poway, California 92128.  On information and belief, KBZ FX, Inc. was formed as a direct result of the threat of this litigation, and is merely the alter-ego of Defendants Erokhin and Joseph.

9.      On information and belief, Defendants Erokhin, Joseph, KBZ FX, and KBZ FX, Inc., and each of them, among other things:  (a) commingled funds and other assets;  (b) treated corporate assets as personal assets; (c) failed to observe corporate formalities and adhere to corporate bylaws; (d) used the corporate structure as a subterfuge for illegal transactions;  and  (e) were undercapitalized; and, therefore, there exists a unity of interest and ownership between each of these named Defendants such that Defendant KBZ FX, Inc. is the Alter Ego of Defendants Erokhin, Joseph, KBZ FX and that any separateness between them has ceased to exist and that to adhere to the fiction of their separate identities would result in injustice.

10.      The true names and capacities, whether individual, corporate, associate, or otherwise, of defendant DOES 1 through 10, inclusive, are unknown to StOps, who therefore sues said defendants by such fictitious names.  StOps will amend this Complaint to state their true names and capacities when the same is ascertained.  StOps is informed and believes that at all times herein mentioned, each defendant named herein was the agent of each of the remaining defendants and, in doing the things herein alleged, was acting within the course and scope of said agency.  Any reference in this Complaint to the actions or inactions of any defendant, whether such reference is made to such defendant by specific name or otherwise, is also a reference to the actions or inactions of DOES 1 through 10, inclusive.

## JURISDICTION AND VENUE

11.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 271.

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a)-(b), and 1367(a).

13.     This Court has personal jurisdiction over Defendants because Defendants reside within, and regularly conduct business within, and specifically direct their business activities to, the State of California and the Southern District of California ("this District").  Defendants have purposefully availed themselves of the opportunity to conduct business in this state through systematic and continuous dealings in this state.  Defendants' actions that give rise to personal jurisdiction include, but are not limited to the following: making, offering for sale, and/or selling infringing products in this District, offering for sale and selling services that use infringing products in this District, knowing and intending that the infringing products would be used in this District, deriving substantial revenue from the use and sale of infringing products within this District, and expecting their infringing actions to have consequences in this District.  Further, Joseph and Erokhin formed a company in this District and have been using that company to solicit contracts with companies residing in this District introduce infringing products into the stream of commerce with the intention those products are purchased and used in this District.

14.     Venue is proper in the Southern District of California under 28 U.S.C. §§ 1391(b)-(c) because a substantial part of the events giving rise to the claims pled herein occurred in this District.  Venue also is proper under U.S.C. § 1400(b) because Defendants have committed, induced others to commit, or contributed to others committing, acts of infringement in this District.

## **BACKGROUND**

15.     On September 23, 2014, the United States Patent and Trademark Office issued the '403 patent, titled "Wearable Partial Task Surgical Simulator." A true and correct copy of the '403 patent is provided as Exhibit 1.

16.     Stuart C. Segall is the owner of the '403 Patent and the president of StOps.

17.     StOps is the exclusive licensee of the '403 Patent and is empowered by virtue of a license agreement to bring this suit in its own name pursuant to 35 U.S.C. § 207(a)(2), to settle claims or suits for infringement, and to grant sublicenses to the '403 Patent.

18.     The '403 Patent pertains to devices and methods for simulating realistic-looking, dynamic injuries that a person may receive during a traumatic event.  The devices claimed in the '403 Patent are especially useful for medical and combat training purposes as they can be worn by "role players" during a simulated traumatic event to mimic a plurality of different combat-related bleeding wounds and internal injuries and allow first responders to perform medical treatment on the same.

19.     Joseph and Erokhin are injury simulation makeup artists formerly employed by StOps.  Joseph worked for StOps from 2006 to 2011.  Erokhin worked for StOps from 2008 to 2011.  During their employment with StOps, Stops invested significant time and resources in the development of human-worn trauma and medical training products, including but not limited to StOps' "Cut Suit."  The Cut Suit embodies or uses one or more inventions claimed in the '403 Patent.

20.     While working for StOps, there were several occasions in which Joseph and Erokhin applied injury simulation makeup to "role players" wearing a Cut Suit and observed live training exercises where the Cut Suit was used to simulate a variety of different traumatic and bleeding wound injuries.

21.     StOps is informed and believes that through their employment with StOps, Joseph and Erokhin gained valuable knowledge and insight into the features and components of the Cut Suit and how those components operate to simulate a traumatic injury or wound.

22.    StOps has previously sued Joseph and Erokhin for Breach of Loyalty, Intentional and Negligent Interference with Employment Relationship, and Violation of the Uniform Trade Secrets Act in San Diego Superior Court Case No. 37-2011-00093508.

23.    As part of the Settlement Agreement, Joseph and Erokhin agreed to refrain from using Strategic Operations' confidential and proprietary technology and trade secret information for any purpose.

24.    Joseph and Erokhin stopped working for StOps on June 21, 2011. After leaving StOps, Joseph and Erokhin formed KBZ FX.  On information and belief, Joseph and Erokhin have consistently worked for KBZ FX from 2011 to the present.  The current website for KBZ FX, www.kbzfx.com, describes the company as "a special effects medical training support system" providing "all branches of military, law enforcement and medical support sources with injury simulations."

25.    Joseph and Erokhin recently developed a human-worn trauma and medical training product that is identified on KBZ FX's website and Instagram account as its "trauma training kit" and described as "a human body replica suit used to perform actual treatments on for medical training" (the "TTK").  A copy of KBZ FX's website showing the Trauma Training Kit http://www.kbzfx.com/trauma-training-kit.php) is attached as Exhibit 2.

26.    On information and belief, the TTK copies StOps' Cut Suit and was made by Joseph and Erokhin for the sole purpose to undercut StOps' Cut Suit business and to compete with StOps in the marketplace.

27.    StOps is informed and believed that KBZ FX previously provided, and continues to provide, injury makeup simulation for Marine Corps training at Camp Pendleton.  StOps is informed and believes that Joseph and Erokhin developed the TTK for use as part of the Marine Corps training at Camp Pendleton, and perhaps elsewhere.

28.     Upon learning of the KBZ FX TTK in the marketplace, StOps through counsel contacted Joseph, Erokhin, and KBZ FX in writing to express StOps' concerns that the TTK may infringe the '403 Patent, and requested an opportunity to inspect the TTK.

29.     Despite being informed of StOps' '403 Patent and StOps concerns that the TTK infringes the '403 Patent, Joseph, Erokhin, KBZ FX, and now KBZ FX, INC. nevertheless continue to make, use, sell, and offer for sale, the TTK.

30.     The use and sale of the TTK by Joseph, Erokhin and KBZ FX violates StOps' patent rights and allows Defendants to unfairly compete against StOps.

## FIRST CAUSE OF ACTION
## Patent Infringement of the '403 Patent
### (Against all Defendants)

31.     StOps realleges and incorporates by reference all paragraphs above as if fully set forth herein.

32.     The TTK embodies and uses inventions claimed in the '403 Patent. For example, on information and belief, the TTK includes a raiment and vest for covering the torso of a person. The raiment has an outer surface with a color and a texture comparable to human skin. Mounted on the outer surface is an orifice that is in fluid communication with a fluid reservoir, thus allowing the person wearing the TTK to selectively expel a blood-like fluid from the reservoir and through the orifice to simulate a bleeding wound or injury. The vest includes an artificial rib cage that is positioned against the inner surface of the raiment to simulate a skeletal structure and prosthetic internal human organs that are removable from the TTK and replaceable with other prosthetic internal human organs, and which is juxtaposed with at least one wound simulator to simulate internal effects of a trauma event.

33.     KBZ FX has and continues to directly infringe the '403 Patent by making, using, offering to sell, and/or selling the TTK.

34.     Defendants have pre-suit knowledge of the '403 Patent.

35.     Prior to the filing of this Complaint, StOps sent Joseph, Erokhin, and KBZ FX a letter notifying them that StOps is the owner of the '403 Patent, that the TTK closely resembles StOps' Cut Suit, that StOps is deeply concerned that the TTK infringes the inventions claimed in the '403 Patent, and that any use of the TTK, by any entity or individual, could constitute infringement.  Enclosed with such letter was a copy of the '403 Patent and copies of computer screenshots showing particular features of the TTK giving rise to StOps' good faith infringement concerns, and requesting an opportunity to inspect the TTK.

36.     Joseph and Erokhin have and continue to induce infringement of the '403 Patent by actively and knowingly inducing others to make, use, sell, and/or offer for sale the TTK.  StOps is informed and believes that Joseph and Erokhin developed the TTK knowing and specifically intending the TTK to copy StOps Cut Suit.  They are the persons in control and authority of KBZ FX and have actively aided and abetted KBZ FX to infringe the '403 Patent by making the TTK and authorizing customers or clients of KBZ FX to use the TTK knowing that use of the TTK by any entity or individual likely infringes the '403 Patent.  In doing so, Joseph and Erokhin have purposefully intended KBZ FX, and others, to infringe the '403 Patent.

37.     Joseph and Erokhin have and continue to contributorily infringe the '403 Patent.  StOps is informed and believes that the TTK was especially made by Joseph and Erokhin to look and function the same as StOps' Cut Suit and that Joseph and Erokhin knowingly and intentionally incorporated the same components and features of StOps' Cut Suit into the TTK, despite knowing that those components and features are covered by the inventions claimed in the '403 Patent.

38.     For example, on information and belief, Joseph and Erokhin designed the TTK to include, among other components, a vest for covering the torso of a person that includes an artificial rib cage and prosthetic internal human organs juxtaposed with at least one wound simulator to simulate internal effects of a trauma event.  Those components of the TTK are not common components suitable for noninfringing use.

39.     StOps is further informed and believes that Joseph and Erokhin have provided its customers, military personnel, and others, with specific instructions on how to use the TTK as a wearable device for simulating a variety of different trauma injuries and that their instructions address only infringing uses of the TTK and/or admissions regarding the intended use of the TTK as a device that embodies or uses the inventions claimed in the '403 Patent.  In allowing KBZ FX and others to use the TTK, Joseph and Erokhin have supplied components of an infringing device which they knew were especially made or adapted for use in an infringing manner and would be used to practice the inventions claimed in the '403 Patent.

40.     At no time has StOps granted Joseph, Erokhin, or KBZ FX authorization, license, or permission to practice the inventions claimed in the '403 Patent.

41.     KBZ FX's acts of direct infringement have been, and continue to be, willful and deliberate and Joseph and Erokhin's acts of indirect infringement were, and continue to be, knowing and intentional.

42.     StOps has been damaged by Defendants' foregoing acts of infringement of the '403 Patent and StOps' will continue to be damaged by such infringement unless enjoined by this Court.  StOps is entitled to recover damages adequate to compensate for the infringement under 35 U.S.C. § 284.

**SECOND CAUSE OF ACTION**

**<u>Breach of Nondisclosure Agreement</u>**

**(Against Joseph and Erokhin)**

43.     StOps realleges and incorporates by reference all paragraphs above as if fully set forth herein.

44.     At the outset of their employment, Joseph and Erokhin each executed a Nondisclosure Agreement with StOps precluding them, without prior written approval by StOps, from using StOps' confidential and proprietary technology and trade secret information for their own benefit, and from publishing, copying, or otherwise disclosing to others or permitting the use of StOps' confidential and proprietary technology and trade secret information by others for their benefit or to the detriment of StOps.  A copy of the Nondisclosure Agreement signed by Joseph is attached as Exhibit 3.  A copy of the Nondisclosure Agreement signed by Erokhin is attached as Exhibit 4.

45.     StOps is informed and believes that Joseph and Erokhin used StOps' confidential and proprietary technology and trade secret information when developing the TTK.

46.     In developing the TTK, Joseph and Erokhin used StOps' confidential and proprietary technology and trade secret information for their benefit and to the detriment of StOps.

47.     At no time has StOps provided written, or verbal, approval to Joseph or Erokhin allowing them to use, publish, copy, disclose, or permit others to use StOps' confidential and proprietary technology and trade secret information for any reason.

48.     StOps did all, or substantially all, acts that the Nondisclosure Agreement required it to do or it was excused from doing those acts.

49.     All conditions required by the Nondisclosure Agreement for Joseph and Erokhin's performance have occurred or were excused.

50.     Joseph and Erokhin breached the Nondisclosure Agreement when they each used StOps' confidential and proprietary technology and trade secret information for their benefit and to the detriment of StOps without permission from StOps to do so.

51.     StOps has been damaged by Joseph and Erokhin's breach of the Nondisclosure Agreement and StOps' will continue to be damaged by such breach unless enjoined by this Court.  StOps is entitled to recover damages adequate to compensate for the breach.

## THIRD CAUSE OF ACTION

## <u>Violation of Cal. Bus. & Profs. Code § 17200</u>

### (Against all Defendants)

52.     StOps realleges and incorporates by reference all paragraphs above as if fully set forth herein.

53.     Defendant's unauthorized use and/or sale of a product that embodies the inventions claimed in the '403 Patent is unfair and offends public policy as it is unlawful, unfair, deceptive, unscrupulous, and substantially injurious to StOps.

54.     Additionally, Joseph and Erokhin's unauthorized use of StOps' confidential and proprietary technology and trade secret information to make a product that embodies the inventions claimed in the '403 Patent or otherwise cause harm to StOps for their own benefit is unfair and offends public policy as it is unlawful, unfair, deceptive, unscrupulous, and substantially injurious to StOps.

55.     Defendants' business practices alleged herein constitute a violation of California's Business and Professions Code Section 17200 *et seq*.

56.     StOps has been damaged by Defendant's unlawful, unfair, deceptive, and unscrupulous business acts alleged herein and StOps' will continue to be damaged by the same unless enjoined by this Court.

57.     StOps is entitled to injunctive relief prohibiting Defendants from continuing such acts of unfair competition and appropriate restitution remedies under California's Business and Professions Code Section 17203.

## **PRAYER FOR RELIEF**

WHEREFORE, in consideration of the foregoing, StOps respectfully prays for a judgment against Defendants:

A.     Finding that the '403 Patent has been infringed by KBZ FX;

B.     Finding that the '403 Patent has been infringed by KBZ FX, Inc.;

C.     Finding that the '403 Patent has been infringed by Erokhin;

D.     Finding that the '403 Patent has been infringed by Joseph;

E.     Finding that Defendants' infringement of the '403 Patent has been willful;

F.     Permanently enjoining Defendants against further infringement of the '403 Patent;

G.     Awarding StOps damages permitted by 35 U. S. C. § 284, including but not limited to pre-judgment interests and costs and increased damages up to three times the amount of compensatory damages;

H.     Finding that this case is an exceptional case and awarding StOps its costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S. C. § 285;

I.     Finding that Joseph and Erokhin have breached the Nondisclosure Agreement;

J.     Permanently enjoining Joseph and Erokhin against further breach of the Nondisclosure Agreement;

K.     Awarding StOps damages adequate to compensate for such brief;

L.     Finding that Defendants have violated California's Business and Professions Code Section 17200 *et seq.*;

1      M.     Permanently enjoining Defendants against further violation of

2   California's Business and Professions Code Section 17200 *et seq.*;

3      N.     Awarding StOps such other relief as the Court deems just and

4   equitable.

5

6                                              EASTMAN & MCCARTNEY LLP
    DATED: July 28, 2017
7

8                                              By:  /s/ Gary L. Eastman

9                                                   Gary L. Eastman, Esq.
                                                    Attorneys for Plaintiff
10                                                  STRATEGIC OPERATIONS, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiff Strategic Operations, Inc. hereby demands a trial by the jury on its claims herein and all issues and claims so triable in this action.

DATED: July 28, 2017

EASTMAN & MCCARTNEY LLP

By: /s/ Gary L. Eastman

Gary L. Eastman, Esq.
Attorneys for Plaintiff
STRATEGIC OPERATIONS, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 1

US008840403B2

(12) **United States Patent**

Segall

(10) Patent No.: **US 8,840,403 B2**

(45) **Date of Patent:** **Sep. 23, 2014**

(54) **WEARABLE PARTIAL TASK SURGICAL SIMULATOR**

(76) Inventor: **Stuart C. Segall**, La Jolla, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 783 days.

(21) Appl. No.: **12/803,609**

(22) Filed: **Jun. 30, 2010**

(65) **Prior Publication Data**

US 2012/0003621 A1    Jan. 5, 2012

(51) **Int. Cl.**
*G09B 23/28* (2006.01)
*G09B 23/30* (2006.01)

(52) **U.S. Cl.**
CPC ............... *G09B 23/28* (2013.01); *G09B 23/30* (2013.01)
USPC ...................................... **434/272**

(58) **Field of Classification Search**
CPC .................................................. G09B 23/28
USPC ...................................... 434/272
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,221,975 A | * | 9/1980 | Ledniczki et al. | 307/116 |
| 4,531,919 A | | 7/1985 | Ware | |
| 5,104,328 A | * | 4/1992 | Lounsbury | 434/273 |

| | | | | |
|---|---|---|---|---|
| 5,305,181 A | * | 4/1994 | Schultz | 361/679.03 |
| 5,990,625 A | * | 11/1999 | Meissner et al. | 315/85 |
| 5,995,077 A | * | 11/1999 | Wilcox et al. | 715/841 |
| 6,057,540 A | * | 5/2000 | Gordon et al. | 250/221 |
| 6,984,208 B2 | * | 1/2006 | Zheng | 600/438 |
| 7,810,504 B2 | * | 10/2010 | Guzman | 128/897 |
| 7,850,456 B2 | * | 12/2010 | Chosack et al. | 434/272 |
| 7,963,770 B2 | * | 6/2011 | Kukora et al. | 434/262 |
| 7,967,679 B2 | * | 6/2011 | Ombrellaro et al. | 463/30 |
| 8,262,668 B2 | * | 9/2012 | Biegun | 606/99 |
| 2007/0243512 A1 | | 10/2007 | King | |
| 2009/0246747 A1 | | 10/2009 | Buckman | |
| 2009/0298034 A1 | | 12/2009 | Parry et al. | |
| 2011/0060555 A1 | * | 3/2011 | Koehler et al. | 703/1 |

* cited by examiner

*Primary Examiner* — Kurt Fernstrom
*Assistant Examiner* — Dolores Collins
(74) *Attorney, Agent, or Firm* — Gary L. Eastman, Esq.

(57) **ABSTRACT**

A wearable device for simulating wounds and injuries received during a trauma event includes a raiment and vest for covering the torso of a person. The raiment has an outer surface with a color and a texture comparable to human skin. Mounted on the outer surface is at least one wound simulator formed with an orifice that is in fluid communication with a fluid reservoir. Thus, the person can selectively expel a blood-like fluid from the reservoir, and through the wound simulator orifice, to simulate a trauma event. The vest includes an artificial rib cage and prosthetic internal organs juxtaposed with at least one wound simulator to simulate internal effects of a trauma event.

**19 Claims, 5 Drawing Sheets**





**FIG. 1**



**FIG. 2A**



**FIG. 2B**          **FIG. 2C**



**FIG. 3A**

**FIG. 3B**



*FIG. 4*

*FIG. 5*



*FIG. 6*

US 8,840,403 B2

1

# WEARABLE PARTIAL TASK SURGICAL SIMULATOR

## FIELD OF THE INVENTION

The present invention pertains generally to devices and methods for use in simulating the injurious effects of a traumatic event on a person. More particularly, the present invention pertains to devices and methods for simulating the wounds and injuries that a person may receive during such an event. The present invention is particularly, but not exclusively, useful as a training aid for providing realistic-looking medical effects to first responders, in a dynamic presentation, when practicing first aid on a person who has experienced trauma.

## BACKGROUND OF THE INVENTION

As is well known, and widely accepted, partial task simulators and training aids can be very effective for teaching individuals how to perform a wide variety of different tasks. More specifically, they can be extremely helpful for teaching an individual how to perform certain medical procedures. In this context, and of particular importance for the present invention, are those medical procedures that are required for response to a life-threatening, emergency situation. The import here is two-fold. Firstly, the partial task simulator should effectively augment the educational background that is necessary to assess an emergency situation. Secondly, it should serve as a tool with which a person can learn how to respond to an emergency situation by properly performing essential life-saving tasks. The efficacy of any partial task simulator or training aid, however, is dependent on the realism it provides and its ability to simulate or mimic an environment where the task is to be actually performed.

With the above in mind, a catastrophic event presents a situation wherein the proper training of emergency medical personnel can be invaluable. Regardless whether the event is the result of an accident, a natural disaster or some form of combat, the consequence of a first response to the event may make the difference between life and death. In such instances, the ability of medical personnel to rapidly and reliably attend to wounds and injuries is of crucial importance. Practice on partial task simulators such as medical mannequins, while valuable as teaching aids, are limited by the mannequin's immobility, weight, expense and minimal interaction with the medical personnel.

In light of the above, it is an object of the present invention to provide a device for realistically and dynamically simulating the wounds and injuries on a person (e.g., role player, actor) that can be received during a traumatic event. Another object of the present invention is to provide a device that effectively functions as a training aid to teach a person how to treat the wounds and injuries that can be received by a person during a traumatic event. Another object of the present invention is to provide a device that effectively functions as a training aid that allows verbal and gesticular interaction between a live human wearing the device and a first responder who is treating the person wearing the device. Still another object of the present invention is to provide a training aid for teaching how to treat wounds and injuries that is easy to use, is simple to manufacture and is comparatively cost effective.

## SUMMARY OF THE INVENTION

In accordance with the present invention, a partial task surgical simulator (training aid device) is provided for simu-

2

lating the wounds and injuries on a role player, actor or model that could be received by a person during a trauma event. Specifically, the device includes a raiment fitting over strapped vests that are dimensioned to cover the torso of a person and therefore be worn by a person in a simulation. Further, the raiment can extend over the person's shoulders and upper arms, as well as over his/her groin area and upper thighs. Structurally, the raiment is made primarily of silicone and nylon fiber, and it is formed as a layer having an inner surface and an outer surface, with the outer surface having a color and a texture that is comparable to human skin. The vest is designed to fit under the raiment and on the torso of a body. Structurally, the vest is made primarily of silicone, nylon fiber, plastic and rubber materials, and it is formed as a shield portion covering the front and side of the torso held in place by straps. The vest provides a protective layer between the raiment and the model or actor. The vest is further designed to provide a detail of the internal structure of a human body, such as the rib cage and internal organs. The vest forms a cavity generally under and below the rib cage in which such prosthetic internal organs can be placed. The importance of the invention is that the simulator presents first responders with realistic-looking, dynamic medical effects that can simulate and mimic a plurality of different wounds and injuries.

As part of the presentation for simulating a trauma event, the device of the present invention comprises a wound simulator that can be selectively attached to the outer surface of the raiment. The wound simulator can then simulate either surface or penetrating wounds and injuries. For example, the wound simulator can be used to simulate surface injuries such as burns, scrapes, abrasions, or the effects of chemical, biological or nuclear agents, or the result of internal injuries from punctures and other injuries. Additionally, the wound simulator can be used to simulate penetrating injuries such as high and low velocity missile wounds caused by gunshot, shrapnel, and blunt/sharp object penetration.

In order to provide added realism for the simulation of penetrating wounds, the raiment is formed with at least one orifice on its outer surface. Further, the raiment includes at least one fluid reservoir that is formed into the layer of the raiment, between its inner and outer surfaces. Specifically, the reservoir is provided for holding a blood-like fluid, and it is connected in fluid communication with the orifice. Thus, the person who is wearing the raiment can selectively expel the blood-like fluid from the reservoir and through the orifice, merely by squeezing the reservoir, to simulate bleeding. Depending on the particularly desired presentation, a wound simulator may be juxtaposed with the orifice to simulate bleeding from the wound.

In addition to the outward appearances of traumatic wounds and injuries mentioned above, the present invention also employs prosthetics to mimic certain internal organs and anatomical structures that may be affected by the trauma event. These prostheses are made of composite materials such as open or closed cell polyurethane foam of various densities, elasticity, and deformation characteristics to simulate internal organs. Specifically, these prostheses can be used to mimic torso injuries (e.g., abdominal, upper torso; as well as other injuries, such as thorax wounds/injuries).

For the simulation of penetrating wounds, the present invention includes access through the raiment, such as through an orifice, to internal organs within the cavity of the vest. Further, the orifice, wound simulators, reservoirs and internal organs are positioned and juxtaposed to simulate various injury scenarios, which may be selectively done. For example, the organs may include a predetermined length of flexible tubing that is comparable in appearance and texture to

US 8,840,403 B2

3

intestines. When used, this pseudo intestine is positioned between the vest and the inner surface of the raiment. Further, a portion of the pseudo intestine can be juxtaposed with at least one orifice in the raiment for use in simulating the penetrating abdominal wound within the torso cavity. Similar simulations can be used for various torso injuries (e.g., lungs, heart, kidneys, stomach, etc.).

BRIEF DESCRIPTION OF THE DRAWINGS

The novel features of this invention, as well as the invention itself, both as to its structure and its operation, will be best understood from the accompanying drawings, taken in conjunction with the accompanying description, in which similar reference characters refer to similar parts, and in which:

FIG. 1 is a front view of a raiment in accordance with the present invention mounted on a human body;

FIG. 2A is a perspective view of a vest in accordance with the present invention mounted on a human body;

FIG. 2B is a front view of a vest in accordance with the present invention;

FIG. 2C is a side view of a vest in accordance with the present invention;

FIG. 3A is a perspective view of the simulator of the present invention with cut away views to show internal features of the raiment;

FIG. 3B is a cross sectional view seen along line 2-2 in FIG. 3A;

FIG. 4 is side view of a simulator in accordance with the present invention mounted on a human body with a cut away view of the vest underneath the raiment;

FIG. 5 is an exploded view of prosthetic internal organs of the present invention; and

FIG. 6 is a perspective view of the prosthetic thorax of the invention.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring initially to FIG. 1, a simulator in accordance with the present invention is shown and designated 13. As shown, a raiment in accordance with the present invention is also shown and designated 10. As shown, the raiment 10 is dimensioned and fitted to cover a person 12 (e.g., person, role player, actor, model). As such, the raiment 10 is a base member of the simulator 13. More specifically, the raiment 10 is intended to be wearable by a person. Accordingly, it is intended to cover the torso of a person 12, and to extend over the shoulders, upper arms, groin area and upper thighs of the person 12. For purposes of this disclosure, the person 12 is shown in FIG. 1 to present these anatomical features. FIG. 1 also indicates that a wound simulator 14 can be used with the raiment 10, and that the raiment 10 can be formed with an orifice 16 from which a blood-like fluid 18 can be expelled. For example, the wound simulator 14 can be used to simulate surface injuries such as burns, scrapes, abrasions, radiation, or the result of internal injuries from punctures and other injuries. Additionally, the wound simulator 14 can be used to simulate penetrating injuries to the internal cavity of the human torso. As further shown in FIG. 1 (and FIGS. 3A and 3B), blood-like fluid 18 may be expelled in various ways (e.g., patches, spots, drops, drips, puddles, ooze spots).

As further shown in FIG. 1, the raiment 10 is made of a layer 20 having an outer surface 24. Preferably, the layer 20 is made of a silicon material that contains nylon fibers. However, other materials may also be used, such as carbon fibers, other composite materials, latex and other rubber materials.

4

In any event, the layer 20 must be sufficiently flexible to allow it to be worn by a person 12 as the person 12 moves to mimic the motions of a severely injured victim of a traumatic event. For this purpose, the outer surface 24 of the raiment 10 is preferably colored and textured to simulate human skin. In alternative embodiments, portions of inner layer 22 may be resin coated to protect the person 12 from being cut, such as by a surgical instrument in simulating trauma events and response to trauma events.

Referring to FIG. 2A, a vest in accordance with the present invention is also shown and designated 11. As shown, vest 11 is dimensioned to fit on the torso of a person 12 underneath the raiment 10. Vest 11 is fitted onto a person 12 by portions 40, 42 and 44 and straps 38a and 38b. More specifically, vest 11 has a first portion 40 covering at least part of the chest of a person 12. Portion 40 is akin to a shield. Portion 40 may be used to protect the person 12 in the course of simulating trauma events and responses to trauma events. Accordingly, it may be made of rigid material, such as polyurethane resin or resin coated.

Vest 11 has a second portion 42 attached to the first portion 40 and forms a cavity 34 in the general area between the first and second portions 40, 42. Vest 11 also has third and fourth side portions 44 attached to the first portion 40 and covering at least part of the sides of the torso of a person 12. Portions 44 may be integrated into portion 40, such as being one continuous portion. Portions 44, 42 and 40 may also be integrated together into one piece constituting the major component of vest 11, other than straps 38. Portions 40, 42 and 44 may also be attached by various conventional mechanical means such as adhesives, fasteners, welding, melding and other joiners. Portions 40, 42 and 44 are preferably constructed of composite or plastic material, but other and additional materials may also be used, such as silicon material that contains nylon fibers, carbon fibers, other composite materials and latex and other rubber materials.

As shown in FIGS. 2A and 2B, portions 40 and 44 have front and back sides 70, 72. In general, the back sides 72 face towards person 12 and the front sides 70 face away from person 12. As also indicated in FIGS. 2A, 2B and 2C, front side 70 of portions 40 and 42 may be colored or textured to mimic or otherwise resemble the internal cavity of the torso of a body.

Also, as shown in FIGS. 2A, 2B and 2C, portion 42 is preferably made as an artificial rib cage 32. As such, portion 42, as rib cage 32, is a prosthetic resembling a human rib cage. Portion 42, including as rib cage 32, is positioned against the inner surface 22 of the raiment 10 (see also FIGS. 3A, 3B, 4) to simulate a skeletal structure. As also shown, at least one prosthetic internal organ 36 (e.g., intestine 30) is positioned within the cavity 34 of the vest 11.

The one or more prosthetic internal organs 36 (e.g., intestine 30 as shown in FIGS. 2A, 2B, and 2C; lungs 46, heart 48, stomach 50, kidneys 52, bladder 54, liver 56, diaphragm 60 and spleen 62 as shown in FIGS. 4 and 5) are attached to vest 11 by fittings, adhesives, fasteners, welding, melding and other joiners. Alternatively, one or more prosthetic internal organ 36 may be positioned within cavity 34 of vest 11 without attachment to vest 11.

As further shown in FIGS. 2A, 2B and 2C, the vest 11 is intended to cover at least a part of the front of the torso of a person 12 and to fit over the person's shoulders or around the person's neck by straps 38a and around the torso of the person by straps 38b. Straps 38a are secured to portion 40 of vest 11 and may be secured together or to other straps by various well known means (e.g., buckles, ties, Velcro, etc.). Straps 38b are

US 8,840,403 B2

5

secured to portion 40 or 44 of vest 11 and may be secured together or to straps 38a in the same fashion.

The structural aspects of the raiment 10 will be more fully appreciated by referencing FIGS. 3A and 3B. There it will be seen that layer 20 of the raiment 10 has inner surface 22 in addition to an outer surface 24. FIGS. 3A and 3B show that the layer 20 of raiment 10 can be formed with one or more reservoirs 26 for holding the blood-like fluid 18 therein. As shown, reservoirs 26 may be embedded in raiment 10 between inner and outer surfaces 22 and 24 or covered by raiment 10. Reservoirs 26 may constitute any shape, including generally rectangular or circular pockets (over the right chest area of person 12 in FIG. 3A), strand like pockets (over the stomach area of person 12 in FIG. 3A) or separate containers (over the left shoulder of person 12 in FIG. 3A). Reservoirs 26 may be attached to raiment 10 by fluid channels 28. Fluid channels 28 preferably constitute flexible tubing mounted under the outer surface 24 of the raiment 10 and may extend and join to reservoirs 26 proximate to or distant from the raiment 10. Tubing for fluid channels 28 may be of predetermined length. Fluid channels 28 constituting such tubing may be positioned against the inner surface 22 of the raiment 10 with a portion thereof juxtaposed with at least one orifice 16. For example, a fluid channel 28 is provided to connect the reservoir 26 in fluid communication with the orifice 16 for use in simulating a penetrating internal wound. Importantly, the reservoir 26 is positioned so it can be squeezed by a hand of a limb of the person 12 who is wearing the raiment 10. Reservoir 26 may be also positioned to be manipulated by the person 12 wearing the raiment 10 to expel blood like fluid 18 in alternative ways, such as by applying pressure with a limb to the reservoir 26 or by changing the position of person 12. This will then cause a portion of blood-like fluid 18 to be expelled from the reservoir 26 and through the orifice 16 to simulate bleeding. As shown, wound simulator 14 may be further aligned with orifice 16 to further simulate the injury, wound or other trauma event.

As shown further in FIG. 3B, reservoir 26 may be filled with blood like fluid 18 and may further be refillable via conventional means, such as filling fluid 18 into reservoir 26 via the same opening for connection of reservoir 26 to channel 28. Or reservoir 26 may be a separate container or pocket with a separate opening for filling reservoir 26 with fluid 18. As such, reservoir 26 may be used to expel fluid 18 for multiple uses. Reservoirs 26 are also preferably replaceable for multiple uses of simulator 13 to simulate multiple trauma events.

Referring back to FIG. 1, it will be appreciated that wound simulator 14 can be juxtaposed with the orifice 16 to simulate a bleeding abrasion. On the other hand, the orifice 16 can be presented as a puncture wound, substantially as shown in FIG. 1, without a surrounding wound simulator 14. By further example, orifice 16 can also present an opening to the cavity 34 of vest 11 to display and access one or more prosthetic internal human organs 36 during simulation of a penetrating wound to the human body. As intended for the present invention, the orifice 16 and the wound simulator 14 can be located anywhere on the raiment 10, as desired, to simulate a plurality of different wound/injury presentations. Also, the wound simulator 14 can be used alone to simulate gas or liquid agent injuries.

In addition to the superficial wound/injury presentations disclosed above, the present invention also envisions presentations for internal injuries. Specifically, with reference to FIGS. 4 and 5, it will be seen that the present invention includes various prostheses for use in simulating wounds/injuries that might be received in a trauma event. These pros-

6

theses include: a prosthetic intestine 30, a prosthetic rib cage 32, prosthetic lungs 46, a prosthetic heart 48, a prosthetic stomach 50, prosthetic kidneys 52, a prosthetic bladder 54, prosthetic liver 56, prosthetic diaphragm 60 and a prosthetic spleen 62. In detail, for example, the prosthetic intestine 30 is a length of flexible hosing that is made to resemble a real intestine. Such flexible hosing may be used as fluid channel 28 or reservoir 26 to selectively expel blood like fluid 18. Alternatively, fluid channel 28 and/reservoir 26 may be selectively attached to the hosing of intestine 30 to simulate bleeding from the intestine 30 during simulation of a trauma event. Similar arrangements can be made with respect to any of the organs 36.

Preferably, the prosthetic internal organs 36 (30, 46, 48, 50, 52, 54, 56, 60, 62) and rib cage 32 are made from composite, plastic or rubber materials. These prostheses of internal organs 36 (30, 46, 48, 50, 52, 54, 56, 60, 62) are most preferably made of composite materials such as open or closed cell polyurethane foam of various densities, elasticity, and deformation characteristics to simulate internal organs. Other and additional materials may also be used, such as silicon material that contains nylon fibers, carbon fibers, other composite materials and latex and other rubber materials. The prosthetic rib cage 32 is preferably made from rigid material, such as rigid polyurethane resin material. In use, both the prosthetic rib cage 32 and any desired combination of prosthetic internal organs (30, 46, 48, 50, 52, 54, 56, 60, 62) are positioned between the body of the person 12 (actor) who is wearing the raiment 10, and the inner surface 22 of the raiment 10 within the cavity 34 of the vest 11.

As shown in FIG. 4, and also in connection with FIGS. 3A and 3B, internal prosthetic organ(s) 36 may be positioned proximate to at least one orifice 16 and at least one fluid reservoir 26 for simulation of a penetrating wound to the human torso. In use, the raiment 10 of the present invention can be used with any combination of superficial wounds/injuries disclosed above. Specifically, there may be a plurality of reservoirs 26, with a corresponding number of orifices 16. Likewise, a plurality of wound simulators 14 can be used.

The prosthetics of organs 36 (i.e. intestine 30, rib cage 32, lungs 46, heart 48, stomach 50, kidneys 52, bladder 54, liver 56, diaphragm 60, spleen 62 (see FIG. 5) and thorax described below may, or may not, be used, as desired. The prosthetic organs 36 may be combined within the cavity 34 in various combinations to simulate wounds and injuries. FIG. 4 shows a preferred embodiment including a large group or package of organs 36. Further, the prosthetic organs 36 may be combined into such packages and formed to represent certain wounds and injuries. For example, a package may be assembled to simulate injuries to the lungs 46 and heart 48 and another package may be assembled to simulate injuries to the stomach 50 and liver 56. The prosthetic organs 36 and packages of prosthetic organs are interchangeable so that various injury scenarios can be simulated. The wound simulators 14, orifices 16, channels 28 and reservoirs 26 are similarly interchangeable and positionable in alternative arrangements so that various injury scenarios can be simulated. And, as explained above, the positions of the wound simulators 14, orifices 16, channels 28, reservoirs 26 and organs 36 may be selectively juxtaposed to simulate various wounds and injuries. Collectively, the component elements of the present invention are intended to be used to simulate or mimic the various wounds/injuries that are likely to be received by a person involved in a traumatic event.

As shown in FIG. 6, in alternative embodiments, penetrating injuries to the thorax can also be simulated by mounting a prosthetic thorax 80 under or on the raiment 10 in the area of

US 8,840,403 B2

7

the neck of the person **12**. In detail, the prosthetic thorax **80** is held on a bib **81** by retaining straps **82***a* and **82***b*, and the bib **81** is mounted or fitted around the neck of person **12**. For example, bib **81** can have straps, ties, Velcro or other fasteners to secure bib **81** at the back of the neck of person **12**. The prosthetic thorax **80** and bib **81** can fit underneath or over raiment **10**. Structurally, the prosthetic thorax **80** includes an elongated hollow tube-like member **84** that has an open end **86** and a closed end **88**. For use, the tube **84** is presented on the bib **81**, and the bib **81** is positioned on the throat of the person **12** with the open end **86** positioned for receipt of a cricothyroid tube (not shown). Thus, the prosthetic thorax **34** can be used for simulating an invasive surgical placement of a cricothyroidotomy. Operationally, the tube-like member **84** is held on the raiment **10** to mimic a thorax, and to present its open end **86** for access thereto with a chest tube during a simulation of a penetrating wound to the thorax. These prostheses can be made of plastic, rubber or composite materials, such as open or closed cell polyurethane foam of various densities, elasticity, and deformation characteristics to simulate internal organs.

Use of the wearable partial task surgical simulator **13** as a teaching aid is accomplished by using the simulator **13** on a person **12** who portrays an injured person in a trauma event. The simulator **13** dynamically simulates the wounds and injuries the person **12** received during the simulated traumatic event. The simulator **13** is set up to simulate a trauma event among various possible scenarios. Simulator **13** allows verbal and gesticular interaction between person **12** wearing the simulator **13** and a first responder (e.g. trainee, trainer, other participant) who is treating the person **12** wearing the simulator **13**.

Accordingly, in using the partial task surgical simulator **13** as a teaching aid, the raiment **10** is provided with at least one wound simulator **14** related to the simulated trauma event and at least one fluid reservoir **26** for holding a blood-like fluid **18** and is in fluid communication with at least one orifice **16**. The vest **11** is provided on person **12** underneath the raiment **10** and provides simulation of the internal skeletal structure (e.g., rib cage **32**) and internal organs (e.g., prosthetic organs **36**) of the person **12** simulating injury in the trauma event. Person **12** selectively expels the blood-like fluid **18** from the reservoir **26** and through the orifice **16** to simulate the trauma event. Simulator **13** is used to mimic a penetrating wound by positioning a predetermined length of flexible tubing (e.g., intestine **30** or fluid channel **28**) against the inner surface **22** of the raiment **10** with a portion thereof juxtaposed with the orifice **16** of at least one superficial wound. At least one fluid reservoir **26** is attached to a length of flexible tubing (e.g., fluid channel **28**) attached to the raiment **10** and reservoir **26** is manipulated to expel blood-like fluid **18**. A first responder selectively accesses at least one prosthetic internal human organ **36** in the cavity **34** through at least one orifice **16** of the raiment **10** during simulation of a penetrating wound to the human body. The prosthetic human internal organs **36** are selected from among multiple combinations of prosthetic human internal organs **36** and used in the cavity **34** of the vest **11** to simulate from among various internal organ structure injuries involved in a selected trauma event.

While the particular Wearable Partial Task Surgical Simulator as herein shown and disclosed in detail is fully capable of obtaining the objects and providing the advantages herein before stated, it is to be understood that it is merely illustrative of the presently preferred embodiments of the invention and that no limitations are intended to the details of construction or design herein shown other than as described in the appended claims.

8

What is claimed is:

1. A wearable device for simulating a trauma event which comprises a raiment dimensioned to cover the torso of a person, wherein the raiment is formed as a layer having an inner surface and an outer surface, and wherein the outer surface has a color and a texture comparable to human skin, and further wherein the raiment has at least one fluid reservoir for holding a blood-like fluid therein and is formed with at least one orifice on the outer surface thereof in fluid communication with the reservoir for selectively expelling the blood-like fluid from the reservoir and through the orifice to simulate the trauma event; and the device further comprising a vest dimensioned to fit on the torso of a person underneath the raiment, wherein the vest has a first portion covering at least part of the chest of a person, a second portion attached to the first portion and forming a cavity generally between the first and second portions, and third and fourth side portions attached to the first portion and covering at least part of the sides of the torso of a person.

2. A device as recited in claim **1** further comprising a wound simulator attached to the outer surface of the raiment to mimic an injury received during the trauma event wherein the wound simulator is juxtaposed with the orifice.

3. A device as recited in claim **1** wherein the raiment extends from the torso over the shoulders and upper arms of the person, and further wherein the raiment extends from the torso over the groin and upper thighs of the person.

4. A device as recited in claim **1** further comprising a predetermined length of flexible tubing mounted under the outer surface of the raiment, wherein the tubing is positioned against the inner surface of the raiment with a portion thereof juxtaposed with at least one orifice for use in simulating a penetrating internal wound.

5. A device as recited in claim **1** wherein the second portion of the vest is an artificial rib cage positioned against the inner surface of the raiment to simulate a skeletal structure and at least one prosthetic internal organ is positioned within the cavity of the vest proximate to at least one orifice and at least one fluid reservoir for simulation of a penetrating wound to the human torso.

6. A device as recited in claim **5** further comprising multiple prosthetic internal organs positioned within the cavity of the vest as a package.

7. A device as recited in claim **5** further comprising multiple packages of prosthetic internal organs that are each positionable within the cavity of the vest to represent various simulations of trauma events.

8. A device as recited in claim **1** wherein at least one fluid reservoir is formed in the layer of the raiment, between the inner surface and the outer surface, and is positioned to be manipulated by the person to expel the blood-like fluid therefrom.

9. A device as recited in claim **1** wherein at least one fluid reservoir is attached to a length of flexible tubing attached to the raiment, and the at least one fluid reservoir is positioned to be manipulated by the person to expel the blood-like fluid therefrom to the tubing and through at least one orifice.

10. A device as recited in claim **9** wherein at least one fluid reservoir is refillable with blood-like fluid for multiple uses by the person to expel the blood-like fluid therefrom.

11. A device for simulating wounds and injuries received by a person during a trauma event which comprises:

a base member formed with at least one reservoir for holding a blood-like fluid therein, and wherein at least one reservoir is positioned on the base member to be manipulated by the person wearing the device to selectively expel the blood-like fluid therefrom;

US 8,840,403 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

at least one wound simulator mounted on the base member and formed with an orifice in fluid communication with the reservoir;

a penetrating wound simulator mounted on the base member; and

a vest proximate to the base member with an access thereto for a prosthetic internal human organ positioned between the vest and base member during simulation of a penetrating wound to the human body,

wherein the base member is a raiment dimensioned to cover the torso of a person and to extend therefrom over the shoulders and upper arms and over the groin and upper thighs of the person, and

further wherein the raiment is formed as a layer having an inner surface and an outer surface, and the outer surface has a color and a texture comparable to human skin, and

wherein the vest is dimensioned to fit on the torso of a person underneath the raiment, and

wherein the vest has a first portion covering at least part of the chest of a person and part of the side of the torso of a person, and a second portion attached to the first portion and forming a cavity generally between the first and second portions.

**12**. A device as recited in claim **11** further comprising a predetermined length of flexible tubing, wherein the tubing is positioned against the inner surface of the raiment with a portion thereof juxtaposed with at least one orifice for use in simulating a penetrating torso wound.

**13**. A device as recited in claim **11** further comprising at least one fluid reservoir attached to a length of flexible tubing attached to the raiment, and the at least one fluid reservoir positioned to be manipulated by the person to expel the blood-like fluid therefrom.

**14**. A device as recited in claim **11** wherein the second portion of the vest is an artificial rib cage positioned against the inner surface of the raiment to simulate a skeletal structure and at least one prosthetic internal human organ is removable from the device and replaceable to the device with another prosthetic internal human organ to select from among and simulate more than one type of wound involved in the trauma event.

**15**. A method for simulating a trauma event which comprises the steps of:

providing a raiment formed as a layer having an inner surface and an outer surface, wherein the outer surface has a color and a texture comparable to human skin, and further wherein the raiment has at least one wound simulator formed with an orifice on the outer surface thereof and has at least one fluid reservoir for holding a blood-like fluid therein, the reservoir being in fluid communication with the orifice of the wound simulator;

providing a vest proximate to the raiment, wherein the vest is dimensioned to fit on the torso of a person underneath the raiment and has a first portion covering at least part of the chest of a person and part of the side of the torso of a person, and a second portion attached to the first portion and forming a cavity generally between the first and second portions, and wherein the second portion of the vest is an artificial rib cage to simulate a skeletal structure and wherein at least one prosthetic internal human organ is positioned in the cavity; and

selectively expelling the blood-like fluid from the reservoir and through the orifice to simulate the trauma event.

**16**. A method as recited in claim **15** further comprising the step of mimicking a penetrating wound by positioning a predetermined length of flexible tubing against the inner surface of the raiment with a portion hereof juxtaposed with the orifice of at least one superficial wound.

**17**. A method as recited in claim **15** further comprising the step of providing at least one fluid reservoir attached to a length of flexible tubing attached to the raiment, and manipulating the at least one fluid reservoir to expel the blood-like fluid therefrom.

**18**. A method as recited in claim **15** further comprising the step of selectively accessing at least one prosthetic internal human organ in the cavity through at least one orifice of the raiment during simulation of a penetrating wound to the human body.

**19**. A method as recited in claim **15** further comprising the step of selecting one combination of prosthetic human internal organs from among multiple combinations of prosthetic human internal organs and using the selected combination in the cavity of the vest to simulate certain internal organ structure injuries involved in the trauma event.

\*   \*   \*   \*   \*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 2





# Trauma Training Kit

Introducing KBZ FX's Trauma Training Kit (TTK). The TTK is an effective and economical way to train your First Responders, Medical Professionals, and Combat Medics on live Role Players. In the past, in-field medical procedure training has been limited to practicing on rescue dummies and mannequins with limited audio and visual feedback resulting in a lack of realism. The TTK is a wearable chest prosthetic as well as a line of limb attachments that are worn by a live person that can give immediate realistic feedback in real time training scenarios. Please contact us (KBZFXmakeup1@gmail.com) for options and pricing.





























1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 3

# STRATEGIC OPERATIONS

## Nondisclosure Agreement

This Nondisclosure Agreement (the "Agreement") is entered into by and between Strategic Operations, Inc., with its principal offices at 4705 Ruffin Road, San Diego CA 92123, ("Disclosing Party") and _____ located at

_Brea Joseph_

_1521 Grove Rd Hills Dr Slogan CA 92012_ ("Receiving Party")

The parties agree to enter into a confidential relationship with respect to the disclosure of certain for the purpose of preventing the unauthorized disclosure of Confidential Information as defined below. proprietary and confidential information ("Confidential Information").

1. **Definition of Confidential Information.** For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility to the business in which Disclosing Party is engaged. In the course of its business Strategic Operations provides facilities and support services to the military and law enforcement agencies and all information about those agencies, in oral, written, or electronic form, including photography, video and audio recordings, and their use of Strategic Operations' facilities and services is confidential information and shall be treated as such by the Receiving Party.

2. **Exclusions from Confidential Information.** Receiving Party's obligations under this Agreement do not extend to information that is: (a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through legitimate means other than from the Disclosing Party or Disclosing Party's representatives; or (d) is disclosed by Receiving Party with Disclosing Party's prior written approval.

3. **Obligations of Receiving Party.** Receiving Party shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party. Receiving Party shall carefully restrict access to Confidential Information to employees, contractors and third parties as is reasonably required and shall require those persons to sign nondisclosure restrictions at least as protective as those in this Agreement. Receiving Party shall not, without prior written approval of Disclosing Party, use for Receiving Party's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of Disclosing Party, any Confidential Information. Receiving Party shall return to Disclosing Party any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if Disclosing Party requests it in writing.

4. **Time Periods.** The nondisclosure provisions of this Agreement shall survive the termination of this Agreement and Receiving Party's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until Disclosing Party sends Receiving Party written notice releasing Receiving Party from this Agreement, whichever occurs first.

5. **Relationships.** Nothing contained in this Agreement shall be deemed to constitute either party's partner, joint venturer or employee of the other party for any purpose.

# STRATEGIC OPERATIONS

**Page Two**

6.   **Severability.** If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to effect the intent of the parties.

7.   **Integration.** This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both parties.

8.   **Waiver.** The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party.

**Disclosing Party:**

_____
(Signature)
Stu Segall, President
Strategic Operations, Inc.
Date: FEB 22 06

**Receiving Party:**

_____
(Signature)
Bree Joseph
(Typed or Printed Name)
Date: 2-22-06

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 4

# STRATEGIC OPERATIONS

## Nondisclosure Agreement

This nondisclosure Agreement (the "Agreement") is entered into by and between Strategic Operations, Inc., with its principal offices at 4705 Ruffin Road, San Diego, CA 92123, ("Disclosing Party") and

Kenny Erakian _____ located at

5551 Carpos Court Rd. Encinitas, CA 92024 ("Receiving Party")

for the purpose of preventing the unauthorized disclosure of Confidential Information as defined below. The parties agree to enter into a confidential relationship with respect to the disclosure of certain proprietary and confidential information ("Confidential Information").

1. **Definition of Confidential Information.** For purposes of this Agreement, "Confidential Information" shall include all information or material that has or could have commercial value or other utility in the business in which Disclosing Party is engaged. In the course of its business Strategic Operations provides facilities and support services to the military and law enforcement agencies and all information about those agencies, in oral, written, or electronic form, including photography, video and audio recordings, and their use of Strategic Operations' facilities and services is confidential information and shall be treated as such by the Receiving Party.

2. **Exclusions from Confidential Information.** Receiving Party's obligations under this Agreement do not extend to information that is "(a) publicly known at the time of disclosure or subsequently becomes publicly known through no fault of the Receiving Party; (b) discovered or created by the Receiving Party before disclosure by Disclosing Party; (c) learned by the Receiving Party through legitimate means other than from the Disclosing Party or Disclosing Party's representatives; or (d) is disclosed by Receiving Party with Disclosing Party's prior written approval.

3. **Obligations of Receiving Party.** Receiving Party shall hold and maintain the Confidential Information in strictest confidence for the sole and exclusive benefit of the Disclosing Party. Receiving Party shall carefully restrict access to Confidential Information to employees, contractors and third parties as is reasonably required and shall require those persons to sign nondisclosure restriction at least as protective as those in this Agreement. Receiving Party shall not, without prior written approval of Disclosing Party, use, for Receiving Party's own benefit, publish, copy, or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of Disclosing Party, any Confidential Information. Receiving Party shall return to Disclosing Party any and all records, notes, and other written, printed, or tangible materials in its possession pertaining to Confidential Information immediately if Disclosing Party requests it in writing.

4. **Time Periods.** The nondisclosure provisions of this Agreement shall survive the termination of this Agreement and Receiving Party's duty to hold Confidential Information in confidence shall remain in effect until the Confidential Information no longer qualifies as a trade secret or until Disclosing Party sends Receiving Party written notice releasing Receiving Party from this Agreement, whichever occurs first.



# STRATEGIC OPERATIONS

5. **Relationships.** Nothing contained in this Agreement shall be deemed to constitute either party a partner, joint venture or employee of the other party for any purpose.

6. **Severability.** If a court finds any provision of this Agreement invalid or unenforceable, the remainder of this Agreement shall be interpreted so as best to affect the intent of the parties.

7. **Integration.** This Agreement expresses the complete understanding of the parties with respect to the subject matter and supersedes all prior proposals, agreements, representations and understandings. This Agreement may not be amended except in a writing signed by both parties.

8. **Waiver.** The failure to exercise any right provided in this Agreement shall not be a waiver of prior or subsequent rights.

This Agreement and each party's obligations shall be binding on the representatives, assigns and successors of such party.

**Disclosing Party:**

(Signature)

Stu Segall, President

Strategic Operations, Inc.

Date: NOV 6 08

**Receiving Party:**

Kasey Eroknin

(Signature)

Kasey Eroknin

(Typed or Printed Name)

Date: 11 6.08